Reed Zars (WY State Bar No. 6-3224)
Attorney at Law
910 E. Kearney Street
Laramie, Wyoming   82070
Telephone: (307) 760-6268
Email: reed@zarslaw.com

Gabriel Clark-Leach (TX State Bar No. 24069516)
Environmental Integrity Project
1206 San Antonio Street
Austin, Texas 78701
Telephone: (512) 637-9479
Email: gclarkleach@environmentalintegrity.org
*Application for admission granted; swearing in scheduled December 2019*

George E. Hays (WA State Bar No. 53874)
P.O. Box 843
Bellevue, Washington 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com
*Application pending for admission*

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

## MIDLAND/ODESSA DIVISION

| | |
|---|---|
| Sierra Club, Plaintiff,<br><br>          v.<br><br>James Lake Midstream, LLC and Canyon Midstream Partners, LLC, Defendants. | Civil Action No.<br><br> 7:19-cv-00280<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.       This Complaint commences a civil action against James Lake Midstream, LLC and Canyon Midstream Partners, LLC, (collectively "JLM") for violations of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. §§ 7401–7671q, at the James Lake Gas Plant ("James Lake") located near Goldsmith, Ector County, Texas on FM 866.

## JURISDICTION AND VENUE

2.       This court has subject matter over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of the Clean Air Act) and 28 U.S.C. § 1331 (federal question statute).  This action seeks injunctive and declaratory relief and civil penalties and is authorized pursuant to 28 U.S.C. §§ 2201 and 2202 (declaratory judgment) and 42 U.S.C. §§ 7413, 7604(a) (Clean Air Act).

3.       Sierra Club demands a trial by jury on all issues so triable.

4.       To the extent required by 42 U.S.C. § 7604(b), Sierra Club sent a notice of intent to sue for violations of the Clean Air Act set forth in this Complaint on March 8, 2019 to JLM and all government officers required to receive such notice by 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2.

5.       On April 18, 2019, the parties entered into a tolling agreement regarding the Clean Air Act violations described in the March 8, 2019 notice of

intent to sue.  The tolling agreement was renewed on June 28, 2019, September 3,

2019, September 30, 2019, November 12, 2019, and November 26, 2019.

6.      Venue is properly vested in this Court pursuant to 42 U.S.C.

§ 7604(c), because James Lake is located in the Western District of Texas.

7.      This case should be heard in the Midland/Odessa Division because

James Lake is located in Ector County.

## PARTIES

8.      Plaintiff Sierra Club is an environmental organization with a long

history of service to the residents and communities of Texas.  Sierra Club's

national headquarters are located at 2101 Webster St., Suite 1300, Oakland, CA

94612.

9.      Sierra Club is the nation's largest, grassroots environmental

organization. It has been working to protect communities, wild places, and the

planet since 1892.  Sierra Club is dedicated to the protection and preservation of

the natural and human environment, including the protection of air quality.

10.     James Lake Midstream, LLC, is a domestic, for-profit corporation,

incorporated in Delaware, and located at 1331 Lamar St., Suite 1674, Houston,

Texas 77010-3133.  At all times relevant to this Complaint, James Lake

Midstream, LLC was and is an owner or operator of James Lake.

11.     Canyon Midstream Partners, LLC, is a domestic, for-profit corporation, incorporated in Delaware, and located at 1331 Lamar St., Suite 1674, Houston, Texas 77010-3133.  At all times relevant to this Complaint, Canyon Midstream Partners, LLC was an owner or operator of James Lake.

## SIERRA CLUB'S INJURIES

12.     James Lake is a natural gas processing facility located in Ector County, Texas.

13.     As a result of its processing activities, James Lake releases into the atmosphere significant amounts of sulfur dioxide ("$SO_2$").  Under Clean Air Act regulations, facilities, 40 C.F.R. § 52.01 are considered "major stationary sources" if they emit or have the potential to emit more than 250 tons per year of any air pollutants.  40 C.F.R. § 52.21(b)(1)(i)(b).

14.     $SO_2$ pollution is "a medically recognized threat to human health." *Ohio Power Co. v. U. S. Entvl. Prot. Agency*, 729 F.2d 1096, 1097–98 (6th Cir. 1984).  It forms sulfates, sulfuric acid mist, and other chemical derivatives that aggravate respiratory illness, contribute to acid deposition, fall to earth as acid rain, and impair visibility.

15.     Sierra Club's members live, work, recreate, and own property in the areas most affected by James Lake's emissions.  Illegal air pollution from this plant plants injures Sierra Club's members' aesthetic, recreational, environmental,

4

spiritual, economic, educational, and health interests in these areas.  Poor air

quality injures human health, wildlife, vegetation, visibility, cultural resources, and

property in areas used by Sierra Club's members.  Unless the relief requested

herein is granted, the violations of the Clean Air Act by James Lake will continue

to injure human health, wildlife, vegetation, visibility, cultural resources, and

property in areas used by Sierra Club's members.

## LEGAL BACKGROUND

16.     The Clean Air Act is designed to "protect and enhance the quality

of the Nation's air resources so as to promote the public health and welfare and the

productive capacity of its population."  Section 101(b)(l) of the Act, 42 U.S.C.

§ 7401(b)(l).

### *The National Ambient Air Quality Standards*

17.     Section 109 of the Act, 42 U.S.C. § 7409, requires the

Administrator of the United States Environmental Protection Agency ("EPA") to

promulgate regulations establishing primary and secondary national ambient air

quality standards ("NAAQS" or "air quality standards") for those air pollutants

("criteria pollutants") for which air quality criteria have been issued pursuant to

Section 108 of the Act, 42 U.S.C. § 7408.  The primary air quality standards are

requisite to protect the public health with an adequate margin of safety, and the

secondary air quality standards are requisite to protect the public welfare from any

5

known or anticipated adverse effects associated with the presence of the air

pollutant in the ambient air.  42 U.S.C. § 7409(b).

18.     Pursuant to Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409,

EPA has identified $SO_2$ as a criteria pollutant and has promulgated air quality

standards for this pollutant. 40 C.F.R. §§ 50.4, 50.5, and 50.17.

19.     Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is

required to designate those areas within its boundaries where the air quality is

better or worse than the air quality standards for each criteria pollutant, or where

the air quality cannot be classified due to insufficient data.  An area that meets the

air quality standard for a particular pollutant is termed an "attainment" area with

respect to such pollutant.  *Id*. at § 7407(d)(1)(A)(ii).  An area that does not meet the

air quality standard for a particular pollutant is termed a "nonattainment" area with

respect to that pollutant.  *Id*. at § 7407(d)(1)(A)(i).  An area that cannot be

classified as either "attainment" or "nonattainment" with respect to a particular

pollutant due to insufficient data is termed "unclassifiable" with respect to that

pollutant and, under the Clean Air Act, is viewed the same as an attainment area.

*Id*. at § 7407(d)(1)(A)(iii).

20.     James Lake is located in Ector County, Texas.  At the times

relevant to this complaint, Ector County has been classified as

unclassifiable/attainment for $SO_2$.  40 C.F.R. § 81.344.

*Prevention of Significant Deterioration*

21.      Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as either attainment or unclassifiable for purposes of meeting the air quality standards.  These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

22.      As part of the PSD program, Section 165(a) of the Act, 42 U.S.C. § 7475(a), among other things, prohibits the "construction" of a "major emitting facility" in an area designated as attainment or unclassifiable unless a permit has been issued that comports with the requirements of Section 165, and the facility employs the "Best Available Control Technology" ("BACT") for each pollutant subject to regulation under the Act that is emitted from the facility.

23.      Section 169(1) of the Act, 42 U.S.C. § 7479(1), designates any stationary source that emits or has the potential to emit 250 tons per year or more of any air pollutant to be a "major emitting facility."

7

24.     Section 169(3) of the Act, 42 U.S.C. § 7479(3) defines BACT, in

pertinent part, as:

> [A]n emission limitation based on the maximum degree of reduction of each
> pollutant subject to regulation under this chapter emitted from or which
> results from any major emitting facility, which the permitting authority, on a
> case-by-case basis, taking into account energy, environmental, and economic
> impacts and other costs, determines is achievable for such facility .... In no
> event shall application of "best available control technology" result in
> emissions of any pollutants which will exceed the emissions allowed by any
> applicable standard established pursuant to section 7411 ... of this title.

25.     CAA Section 165(a)(3), 42 U.S.C. § 7475(a)(3), allows issuance of

a PSD permit only if "the owner or operator of such facility demonstrates, as

required pursuant to section 7410(j) of this title, that emissions from construction

or operation of such facility" will not compromise compliance with applicable air

quality standards.

*Texas State Implementation Plan*

26.     Pursuant to CAA Section 110, 42 U.S.C. § 7410, each State must

adopt and submit to the EPA for approval a State Implementation Plan ("SIP") to

attain and maintain air quality standards.  Such plans must also include, among

other things, regulations to prevent the significant deterioration of air quality under

CAA Sections 161-165, 42 U.S.C. §§ 7471-7475.

27.     Pursuant to CAA Section 302(q), 42 U.S.C. § 7602(q), an

applicable implementation plan is the implementation plan, or most recent revision

8

thereof, which has been approved by EPA pursuant to CAA Section 110, 42 U.S.C.

§ 7410, or promulgated by EPA pursuant to CAA Section 110(c), 42 U.S.C.

§ 7410(c), and which implements the relevant requirements of the Act.  Upon EPA

approval, SIP requirements are federally enforceable under Section 113 of the Act,

42 U.S.C. § 7413, and 40 C.F.R. § 52.23.

28.    A state may comply with CAA Section 161, 42 U.S.C. § 7471, by

having its own PSD regulations approved by EPA as part of its SIP, which must be

at least as stringent as those set forth at 40 C.F.R. § 51.166.

*The State of Texas' PSD Program*

29.    The State of Texas' State Implementation Plan contains elements

that make up its PSD program, including provisions in 30 TAC Chapter 116.

30.    30 TAC § 116.110(a)(approved by EPA September 6, 2006 (71

Fed. Reg. 52,664) effective October 6, 2006; *see* 40 C.F.R. § 52.2270), provides

that:

> Before any actual work is begun on the facility, any person who plans to construct any new facility or to engage in the modification of any existing facility which may emit air contaminants into the air of this state shall either:
>
> > (1) obtain a permit under Section 116.111 of this title (relating to General Application);
> >
> > (2) satisfy the conditions for a standard permit under the requirements in ... (A) Subchapter F of the chapter relating to Standard Permits....
> >
> > (3) NOT IN SIP [regarding flexible air permits]

9

(4) satisfy the conditions for facilities permitted by rule under Chapter 106 of this title (relating to Permits by Rule), or

(5) NOT IN SIP [satisfy criteria for de minimis sources]

31.      30 TAC § 116.111(a) requires that:

In order to be granted a permit...the application must include....

(2) information which demonstrates that emissions from the facility … meet all of the following.

(I) Prevention of Significant Deterioration (PSD) review.  If the proposed facility is located in an attainment area, it shall comply with all applicable requirements in this chapter concerning PSD review.

32.      Texas PSD review requirements are found in 30 TAC §§ 116.160 -

116.169.  30 TAC § 116.160(a) states (emphasis added):

Each proposed **new major source** or major modification in an attainment or unclassifiable area shall comply with the requirements of this section.  The owner or operator of a proposed new or modified facility that will be a new major stationary source for the prevention of significant deterioration air contaminant shall meet the additional requirements of subsection (c)(1) - (4) of this section.

33.      Under 30 TAC § 116.12(19), a "major source" is defined as:

[A]ny stationary source that emits, or has the potential to emit, a threshold quantity of emissions or more of any air contaminant (including volatile organic compounds (VOCS)) for which a national ambient air quality standard has been issued….  [T]he major source thresholds for prevention of significant deterioration pollutants are identified in 40 Code of Federal Regulations (C.F.R.) § 51.166(b)(1)….

10

34.     Under 40 C.F.R. § 51.166(b)(1)(i)(b), the major source threshold

for $SO_2$ for a facility like James Lake is 250 tons per year.

35.     Under 30 TAC §§ 116.610(b) & (c), sources subject to PSD cannot

obtain standard permits:

> (b) Any project, except those authorized under §116.617 of this title (relating
> to Standard Permits for Pollution Control Projects), which constitutes a new
> major source, or major modification under the new source review
> requirements of the FCAA, Part C (Prevention of Significant Deterioration
> Review) or Part D (Nonattainment Review) and regulations promulgated
> thereunder is subject to the requirements of §116.110 of this title (relating to
> Applicability) rather than this subchapter.
>
> (c) Persons may not circumvent by artificial limitations the requirements of
> §116.110 of this title.
> S

36.     Under 30 TAC Chapter 116 of the Texas SIP, the Texas

Commission on Environmental Quality ("TCEQ") issues "Standard Permits" to air

pollution sources.

37.     On January 13, 2014, TCEQ received a registration sent by JLM for

a Standard Permit.

38.     On May 14, 2014, JLM received a letter from TCEQ providing

James Lake with Standard Permit Registration Number 116553 and a Standard

Permit Maximum Emission Rates Table for that Permit.

39.     30 TAC § 116.115(b)(2)(F) provides:

11

Holders of permits, special permits, standard permits, and special exemptions shall comply with the following:

…

(F)  Maximum allowable emission rates.  The total emissions of air contaminants from any of the sources of emissions must not exceed the values stated on the table attached to the permit entitled "Emission Sources-- Maximum Allowable Emission Rates."  Emissions that exceed the maximum allowable emission rates are not authorized and are a violation of the permit.

40.     As issued on May 14, 2014, Standard Permit 116553 contained the following limits:

 (i)      8790.145 lbs/hr of $SO_2$ from FL-2[1]

 (ii)     246.12 tons per year of $SO_2$ from FL-2

 (iii)    8790.79 lbs/hr of $SO_2$ from James Lake

 (iv)    248.94 tons per year of $SO_2$ from James Lake

41.     On May 2, 2018, JLM received a letter from TCEQ acknowledging that JLM had certified new emissions for James Lake under Standard Permit 116553.  As updated on that date, Standard Permit 116553 contains the following limits:

 (i)      <0.01 lbs/hr of $SO_2$ from FL-2

---

[1] **Error! Main Document Only.**FL-2 is James Lake's acid gas flare and is also referred to as FL-720.  FL-1 is also referred to as the "emergency flare" and FL-721.

    (ii)    <0.01 tons per year of $SO_2$ from FL-2

    (iii)   89.19 lbs/hr of $SO_2$ from James Lake

    (iv)   15.04 tons per year of $SO_2$ from James Lake

### *The Clean Air Act's Title V Operating Permit Program*

42.    Title V of the Act, 42 U.S.C. §§ 7661-7661f, establishes an operating permit program for certain sources, including "major sources" and any source required to have a PSD permit.  42 U.S.C. § 7661a(a).  A "major source" for purposes of Title V is defined, among other things, as a source with a potential to emit greater than 100 tons per year of any criteria pollutant.  42 U.S.C. § 7661(2)(B); *id.* § 7602(j)

43.    Pursuant to Section 502(b) of the Act, 42 U.S.C. § 7661a(b), on July 21, 1992, the EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a major source operating permit program to be administered by any air pollution control agency.  57 Fed. Reg. 32,250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

### *The State of Texas Federal Operating Permit Program*

44.    EPA has approved the federal operating permit program for the State of Texas.  *See* 40 C.F.R. Part 70, App. A.

45.    30 TAC § 122.121 provides that:

Except as provided in § 122.138 of this title (relating to Application Shield), owners and operators of sites identified in § 122.120 of this title (relating to Applicability) shall not operate emission units at those sites without a permit issued or granted under this chapter

46.      Chapter 122 of Title 30 of the Texas Administrative Code addresses the Federal Operating Permits Program.

47.      30 TAC § 122.120 provides as follows:

(a) Except as identified in subsection (b) of this section, owners and operators of one or more of the following are subject to the requirements of this chapter:

> (1) any site that is a major source as defined in §122.10 of this title (relating to General Definitions)
>
> …
>
> (4) any site that is a non-major source which the United States Environmental Protection Agency (EPA), through rulemaking, has designated as no longer exempt or no longer eligible for a deferral from the obligation to obtain a permit. For the purposes of this chapter, those sources may be any of the following:
>
> > (A) any non-major source so designated by the EPA, and subject to a standard, limitation, or other requirement under FCAA, § 111 (Standards of Performance for New Stationary Sources).

48.      30 TAC §122.10(13)(C) provides as follows:

The definitions in the Texas Clean Air Act, Chapter 101 of this title (relating to General Air Quality Rules), and Chapter 3 of this title (relating to Definitions) apply to this chapter. In addition, the following words and

14

terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise.

…

(13) Major Source –

…

(C)    Any site which directly emits or has the potential to emit, 100 tpy or more of any air pollutant.

49.    Under 30 TAC § 122.130(b), new sites cannot operate until an abbreviated application is submitted.

50.    Under 30 TAC § 122.134(c), if an applicant has submitted an abbreviated application, the Executive Director shall inform the application of the deadline for submitting the remaining information.

51.    Under 30 TAC § 122.136, if "an applicant omits any relevant facts or submits incorrect information in an application, the applicant shall submit the relevant facts or correct the information no later than 60 days after discovering the error."

52.    On May 27, 2015, TCEQ notified JLM that, under Texas's Federal Operating Permit Program, James Lake qualified for Oil and Gas General Operating Permit (GOP) 514.  Specifically, the letter stated (emphasis added):

After reviewing your initial application, the Texas Commission on Environmental Quality (TCEO) executive director has determined that the

15

emission units identified at the James Lake Gas Plant qualify for the Oil and Gas General Operating Permit (GOP) Number 514, if operated as represented in your application. This letter serves to authorize James Lake Midstream LLC, James Lake Gas Plant, to operate the emission units identified in the GOP application under the provisions of GOP Number 514. This authorization is granted based on the information provided in your application. **In the event the agency subsequently determines that the emission units do not qualify for the GOP or are not operating in compliance with the GOP, enforcement action may be initiated.**

53.     Condition (a)(2) of GOP 514 (both as in effect on May 27, 2015

and the version that took effect in July 2017) provides that:

> Emission units authorized by any case-by-case New Source Review (NSR) permits under Title 30 Texas Administrative Code (TAC) Chapter 116 (Control of Air Pollution by Permits for New Construction or Modification) shall not be authorized under this GOP.

*New Source Performance Standards*

54.     Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A),

requires the Administrator of EPA to publish a list of categories of stationary

sources that emit or may emit any air pollutant. The list must include any

categories of sources which are determined to cause or significantly contribute to

air pollution which may endanger public health or welfare.

55.     Clean Air Act Section 111(b)(1)(8), 42 U.S.C. § 7411(b)(1)(B),

requires the Administrator of EPA to promulgate regulations establishing federal

standards of performance for new sources of air pollutants within each of these

categories. "New sources" are defined as stationary sources, the construction or

16

modification of which is commenced after the publication of the regulations or

proposed regulations prescribing a standard of performance applicable to such

source. 42 U.S.C. § 7411(a)(2).

56.     Pursuant to Clean Air Act Section 111(b)(1)(A), 42 U.S.C.

§ 7411(b)(1)(A), EPA has promulgated NSPS Subpart OOOO, 40 C.F.R.

§§ 60.5360 - 5430, which applies to natural gas processing facilities with

sweetening units, such as James Lake.

57.     40 C.F.R. § 60.5365(g) provides that:

> You are subject to the applicable provisions of this subpart if you are the owner or operator of one or more of the onshore affected facilities listed in paragraphs (a) through (g) of this section for which you commence construction, modification or reconstruction after August 23, 2011, and on or before September 18, 2015.

> > (g) Sweetening units located at onshore natural gas processing plants that process natural gas produced from either onshore or offshore wells.

> > > (1) Each sweetening unit that processes natural gas is an affected facility; and

> > > (2) Each sweetening unit that processes natural gas followed by a sulfur recovery unit is an affected facility.

> > > (3) Facilities that have a design capacity less than 2 long tons per day (LT/D) of hydrogen sulfide ($H_2S$) in the acid gas (expressed as sulfur) are required to comply with recordkeeping and reporting requirements specified in §60.5423(c) but are not required to comply with §§60.5405 through 60.5407 and §§60.5410(g) and 60.5415(g) of this subpart.

(4) Sweetening facilities producing acid gas that is completely reinjected into oil-or-gas-bearing geologic strata or that is otherwise not released to the atmosphere are not subject to §§60.5405 through 60.5407, 60.5410(g), 60.5415(g), and 60.5423 of this subpart.

58.　　40 C.F.R. § 60.5405(b) provides that:

After demonstrating compliance with the provisions of paragraph (a) of this section, you must achieve at a minimum, an SO2 emission reduction efficiency (Zc) to be determined from Table 2 of this subpart based on the sulfur feed rate (X) and the sulfur content of the acid gas (Y) of the affected facility.

59.　　Table 2, referred to in the previous paragraph, provides as follows:

Table 2 to Subpart OOOO of Part 60—Required Minimum $SO_2$ Emission Reduction Efficiency ($Z_c$)

| H2S content of acid gas (Y), % | Sulfur feed rate (X), LT/D | | | |
|---|---|---|---|---|
| | $2.0 \leq X \leq 5.0$ | $5.0 < X \leq 15.0$ | $15.0 < X \leq 300.0$ | $X > 300.0$ |
| $Y \geq 50$ | 74.0 | $85.35X^{0.0144}Y^{0.0128}$ or 99.9, whichever is smaller. | | |
| $20 \leq Y < 50$ | 74.0 | $85.35X^{0.0144}Y^{0.0128}$ or 97.5, whichever is smaller | | 97.5 |
| $10 \leq Y < 20$ | 74.0 | $85.35X^{0.0144}Y^{0.0128}$ or 90.8, whichever is smaller | 90.8 | 90.8 |
| $Y < 10$ | 74.0 | 74.0 | 74.0 | 74.0 |

X = The sulfur feed rate from the sweetening unit (*i.e.,* the H2S in the acid gas), expressed as sulfur, Mg/D(LT/D), rounded to one decimal place.

Y = The sulfur content of the acid gas from the sweetening unit, expressed as mole percent H2S (dry basis) rounded to one decimal place.

Z = The minimum required sulfur dioxide (SO2) emission reduction efficiency, expressed as percent carried to one decimal place. $Z_i$ refers to the reduction efficiency required at the initial performance test. $Z_c$ refers to the reduction efficiency required on a continuous basis after compliance with $Z_i$ has been demonstrated. Table 2 to Subpart OOOO of Part 60—Required Minimum SO2 Emission Reduction Efficiency ($Z_c$)

*Enforcement Provisions*

60.     The Clean Air Act provides a cause of action for "any person" to file suit against any other person who is alleged to have violated or be in violation of an emission standard or limitation under the CAA.  42 U.S.C. § 7604(a)(1).

61.     Additionally, the Act provides a separate cause of action by any person against any other person who constructs any new or modifies any existing major facility without the required permits.  42 U.S.C. § 7604(a)(3).

62.     The Sierra Club and JLM in this case are all "persons" within the meaning of the Clean Air Act.  42 U.S.C. § 7602(e).

63.     An "emission standard or limitation," within the meaning of 42 U.S.C. § 7604(a)(1), is defined in 42 U.S.C. § 7604(f)(4).

64.     An "emission standard or limitation" includes "any . . . standard . . . under any applicable [s]tate implementation plan" and "any requirement to obtain a permit as a condition of operations."  42 U.S.C. § 7604(f)(4).

65.     The Court is authorized to order injunctive relief as well as civil penalties in amounts up to $37,500 per day per violation for violations occurring after January 12, 2009 until November 2, 2015, and up to $99,681 per day per violation for violations occurring after November 2, 2015 and for which penalties are assessed on or after February 6, 2019.  42 U.S.C. §§ 7413(b) and 7413(e); 40 C.F.R. Part 19.

19

66.      Penalties are paid to the United States Treasury, except that the Court may authorize that penalties up to $100,000 be paid into a beneficial mitigation project fund used to enhance the public health or environment.  42 U.S.C. § 7604(g)(2).

## RELEVANT FACTS

67.      James Lake is a cryogenic gas processing plant.

68.      Construction of the James Lake Gas Plant began no earlier than March 9, 2014.

69.      James Lake has an inlet capacity of 110 MMcf/day.

70.      James Lake accepts field natural gas collected from wells in the area where the plant is located and then compresses it.

71.      The field natural gas is brought to the plant site by approximately 90 miles of gathering trunklines and eight field compressor stations in Ector County, Andrews County, and Winkler County, Texas.

72.      The James Lake system is capable of gathering, treating and processing field natural gas containing carbon dioxide ("$CO_2$") and hydrogen sulfide ("$H_2S$").

73.      Field natural gas containing $H_2S$ and $CO_2$ is known as "sour."

74.      James Lake uses chemicals known as amines in an aqueous solution to absorb the $H_2S$ and $CO_2$ out of the field natural gas.

20

75.     The resulting amine solution is termed "rich."

76.     James Lake's operators reuse the amine chemicals, and to do so, they heat the rich amine solution in a "regenerator" to strip out the $H_2S$ and $CO_2$.

77.     Stripped out $H_2S$ and $CO_2$ is known as "acid gas."

78.     When the James Lake plant is working properly, stripped-out acid gas is compressed and disposed of by being injected into an acid gas injection well.

79.     Once acid gas has been stripped from the field natural gas, the remaining gas, is termed "sweet."

80.     James Lake then further processes the remaining sweet gas to separate out lighter natural gas from heavier hydrocarbons.  The sweet natural gas is then shipped out of the plant via pipeline, while the heavier hydrocarbons, called natural gas liquids, are stored in pressurized tanks and removed via truck or pipeline.

81.     When the injection well is down for maintenance, startup, or shutdown, James Lake's operators route the acid gas to a flare, which burns the gas, converting the $H_2S$ to sulfur dioxide ($SO_2$).

82.     In 2014, James Lake emitted 9 tons of $SO_2$.

83.     In 2015, James Lake emitted 654 tons of $SO_2$.

84.     In 2016, James Lake emitted 1009 tons of $SO_2$.

85.     In 2017, James Lake emitted 569 tons of $SO_2$.

86.     In 2018, James Lake emitted 105 tons of $SO_2$.

87.     In 2019, James Lake emitted 153 tons of $SO_2$.

88.     Most of the $SO_2$ emitted from James Lake, as described in the six preceding paragraphs, came from James Lake's acid gas flare.

89.     The annual emissions described in the seven preceding paragraphs occurred during 273 emission events set forth in Appendix A to this complaint.

90.     Plaintiffs allege each "cell" in Appendix A as a separate fact that requires a separate response.  For example, through Row 3 of Appendix A, Plaintiffs allege that:

    a.  There was an incident that occurred at James Lake that TCEQ has identified as Incident Number 206621.

    b.  Incident Number 206621 began on November 18, 2014 at 10:15 a.m.

    c.  Incident Number 206621 ended on November 18, 2014 at 7:45 p.m.

    d.  Incident Number 206621 occurred in 2014.

    e.  Incident Number 206621 lasted 9.5 hours.

    f.  Incident Number 206621 occurred at Emission Point FL2.

    g.  During Incident Number 206621, James Lake emitted 28.67 pounds of $SO_2$.

22

# CLAIMS FOR RELIEF

## Sierra Club's First Claim for Relief

### Violations of Sulfur Dioxide Emission Limits
### For Standard Permit 116553, the Maximum Emission
### Rate Table and 30 TAC § 116.115(b)(2)(F)

91.     Sierra Club realleges all preceding paragraphs as if set forth herein.

92.     JLM repeatedly violated Standard Permit 116553, the Maximum Emission Rate Table, and 30 TAC § 116.115(b)(2)(F) by exceeding the $SO_2$ annual emission limit for FL-2 of 246.12 tons per year for calendar years 2015, 2016, and 2017.

93.     JLM repeatedly violated Standard Permit 116553, the Maximum Emission Rate Table, and 30 TAC § 116.115(b)(2)(F) by exceeding the $SO_2$ annual emission limit for James Lake of 248.94 tons per year for calendar years 2015, 2016, and 2017.

94.     JLM repeatedly violated Standard Permit 116553, the Maximum Emission Rate Table, and 30 TAC § 116.115(b)(2)(F) by exceeding the hourly $SO_2$ limits for FL-2 of 8790.145 lb/hr $SO_2$ (applicable from May 14, 2014 to May 1, 2018) or of <0.01 lb/hr $SO_2$ (applicable May 2, 2018) during the following dates:[2]

---

[2] Each value in the table in this paragraph should be separately addressed with an admission or denial.

| Air Emissions Event Incident Number | Dates | Average $SO_2$ Rate over Duration of Incident, lb/hr | Number of Exceedances of 8,790.145 lb/hr $SO_2$ Limit |
|---|---|---|---|
| 240601 | 8/2/2016 | 9,418.338 | 1 |
| 242054 | 8/10/2016 | 14,148.780 | 1 |
| 241928 | 8/15-16/2016 | 11,109.419 | 3 |
| 244472 | 9/23/2016 | 9,038.719 | 1 |
| 246499 | 11/2/2016 | 12,345.289 | 1 |
| 248464 | 12/8-9/2016 | 9,418.014 | 10 |
| 251313 | 12/13/2016 | 39,560.556 | 2 |
| 251472 | 12/13/2016 | 39,560.556 | 2 |
| 250206 | 1/10/2017 | 12,073.640 | 1 |
| 258006 | 5/16/2017 | 13,720.036 | 1 |
| 259729 | 6/6/2017 | 12,512.459 | 6 |
| 260541 | 6/19/2017 | 17,252.000 | 1 |
| 262146 | 6/29/2017 | 18,709.785 | 6 |
| 301622 | 1/27-28/2019 | 11,712.519 | 22 |

95.     JLM repeatedly violated Standard Permit 116553, the Maximum Emission Rate Table, and 30 TAC § 116.115(b)(2)(F) by exceeding the hourly $SO_2$ limit of 8790.79 lb/hr $SO_2$ (applicable from May 14, 2014 to May 1, 2018) or of <0.01 lb/hr SO2 (applicable May 2, 2018) for James Lake 58 times during the following dates:[3]

---

[3] Each value in the table in this paragraph should be separately addressed with an admission or denial.

| Air Emissions Event Incident Number | Dates | Average $SO_2$ Rate over Duration of Incident, lb/hr | Number of Exceedances of 8,790.79 lb/hr $SO_2$ Limit |
|---|---|---|---|
| 240601 | 8/2/2016 | 9,418.338 | 1 |
| 242054 | 8/10/2016 | 14,148.780 | 1 |
| 241928 | 8/15-16/2016 | 11,109.419 | 3 |
| 244472 | 9/23/2016 | 9,038.719 | 1 |
| 246499 | 11/2/2016 | 12,345.289 | 1 |
| 248464 | 12/8-9/2016 | 9,418.014 | 10 |
| 251313 | 12/13/2016 | 39,560.556 | 2 |
| 251472 | 12/13/2016 | 39,560.556 | 2 |
| 250206 | 1/10/2017 | 12,073.640 | 1 |
| 258006 | 5/16/2017 | 13,720.036 | 1 |
| 259729 | 6/6/2017 | 12,512.459 | 6 |
| 260541 | 6/19/2017 | 17,252.000 | 1 |
| 262146 | 6/29/2017 | 18,709.785 | 6 |
| 301622 | 1/27-28/2019 | 11,712.519 | 22 |

96.     The violations set forth in the preceding four paragraphs are continuing.

## **Sierra Club's Second Claim for Relief**

### **Violation of 30 TAC § 116.110(a)**

97.     Sierra Club realleges all preceding paragraphs as set forth herein.

98.      Under 30 TAC § 116.12(19), James Lake is a "major source" for purposes of the Clean Air Act's Prevention of Significant Deterioration program in the Texas SIP because it emitted more than 250 tons per year of $SO_2$ between the time the plant began operation in 2014 and March 12, 2015.

99.      James Lake continued to emit above major source thresholds from March 12, 2015 until June 14, 2018.

100.      Under 30 TAC § 116.610(b) & (c), sources subject to the Prevention of Significant Deterioration program are ineligible for Standard Permits.  Consequently, as of March 12, 2015, James Lake became a Prevention of Significant Deterioration source.

101.      JLM therefore violated 30 TAC § 116.110(a) by constructing and operating James Lake without a permit issued pursuant to 30 TAC § 116.111 containing Prevention of Significant Deterioration requirements, including Best Available Control Technology, that apply to major sources.

102.       JLM has violated this requirement every day the plant has operated since March 12, 2015.

### Sierra Club's Third Claim for Relief

### Violation of Section 7475 of the Clean Air Act

103.      Sierra Club realleges all preceding paragraphs as if set forth herein.

27

104.     Pursuant to the facts laid out in the Second Claim for Relief, JLM is violating 42 U.S.C. § 7475, which prohibits the construction of a major emitting facility without a Prevention of Significant Deterioration Permit and without Best Available Control Technology.

105.     This violation began on March 12, 2015 and has continued every day the plant has operated since that time.

### Sierra Club's Fourth Claim for Relief

### Violation of 30 TAC § 122.121

106.     Sierra Club realleges all preceding paragraphs as if set forth herein.

107.     JLM submitted an abbreviated application for a General Operating Permit a (GOP) on October 29, 2014.

108.     JLM submitted a complete application for a GOP on December 22, 2014.

109.     As set forth above, James Lake's emissions exceeded the major source threshold as of March 12, 2015.

110.     In its GOP permit applications, JLM did not disclose that the facility is a major source for Prevention of Significant Deterioration program purposes.  Once the facility became a major source, JLM was obligated under 30 TAC § 122.136 to correct its application within 60 days.  JLM did not, however, disclose the change in circumstances to TCEQ.

28

111.     On May 27, 2015, TCEQ authorized to operate under GOP Number

514.  In providing that authorization, TCEQ stated:

> Emission units authorized by any case-by-case New Source Review (NSR)
> permits under Title 30 Texas Administrative Code (TAC) Chapter 116
> (Control of Air Pollution by Permits for New Construction or Modification)
> shall not be authorized under this GOP.

112.     Accordingly, because at the time of issuance, James Lake was

already subject to case-by-case new source review (the facility required a PSD

permit), the GOP permit was immediately void.  Consequently, since May 27,

2015, the facility has been operating without a federal operating permit in violation

of 30 TAC § 122.121.

## Sierra Club's Fifth Claim for Relief

## Violation of 40 C.F.R. § 60.5405(b)

113.     Sierra Club realleges all preceding paragraphs as if set forth herein.

114.     James Lake is a natural gas processing facility with a sweetening

unit.  Therefore, it is subject to NSPS Subpart OOOO.  See 40 C.F.R.

§ 60.5365(g).

115.     In its initial application for a standard permit, JLM disclosed that

James Lake's uncontrolled acid gas flow from its regenerator would be 20,482.5

tons per year, or around 50 long tons per day.  Therefore, because the facility has

the capacity to process more than two long tons per day of hydrogen sulfide, it is not entitled to the exemptions in 40 C.F.R. § 60.5365(g)(3).

116.   In that same permit application, JLM asserted that James Lake's sweetening unit would not be subject to Subpart OOOO because its acid gas was being routed to an injection well: "The amine unit will also be exempted from coverage because the amine still vent emissions will be routed to an acid gas injection well."

117.   Under 40 C.F.R. § 60.5365(g)(4), complete acid gas injection into the ground exempts sweetening units from most of Subpart OOOO's requirements:

> Sweetening facilities producing acid gas that is **completely reinjected** into oil-or-gas-bearing geologic strata or that is otherwise not released to the atmosphere are not subject to §§60.5405 through 60.5407, 60.5410(g), 60.5415(g), and 60.5423 of this subpart.

(Emphasis added).

118.   James Lake is not achieving complete reinjection of the acid gas from the sweetening unit.  Almost 2,500 tons of $SO_2$ have been emitted since the plant began operation in late 2014, and most of this $SO_2$ comes from flaring acid gas from the sweetening unit that was never reinjected into the ground.

119.   Sweetening facilities subject to all of the requirements of Subpart OOOO, as alleged here, must meet an $SO_2$ emission reduction efficiency

requirement through the use of some $SO_2$ control device, such as a sulfur recovery unit.  See 40 C.F.R. § 60.5405(b).

120.     Given the sulfur content of the acid gas the sweetening unit generates, according to Table 2 of Subpart OOOO, James Lake must achieve between a 74.0% and 97.5% $SO_2$ reduction efficiency, with the specific daily $SO_2$ reduction efficiency required by Subpart OOOO dependent on the daily sulfur feed rate from the sweetening unit (i.e., the $H_2S$ in the acid gas expressed as sulfur in long tons per day).

121.     When James Lake injects the acid gas into the oil- or gas-bearing geologic strata, JLM presumably achieves "complete reinjection," but no control of $SO_2$ occurs when James Lake is flaring the acid gas.

122.     Given the $SO_2$ control efficiency requirements of Subpart OOOO, James Lake violated the $SO_2$ control efficiency requirements required to be met under 40 C.F.R. § 60.5405(b) for 170 days between November 17, 2014 and January 28, 2019, due to flaring of the acid gas from the sweetening unit on those days.  The specific days of violation and flaring events are provided in Appendix B to this complaint.

## REQUEST FOR RELIEF

WHEREFORE, Sierra Club respectfully requests that the Court grant the following relief:

123.    Declare that JLM violated and is violating the Clean Air Act;

124.    Permanently enjoin JLM from operating the James Lake except in accordance with the Clean Air Act, and the Texas SIP;

125.    Order JLM to submit required permit applications, obtain required permits, comply with the requirements of any permits obtained, and submit correct compliance certifications;

126.    Order JLM to take other appropriate steps to remedy, mitigate, and offset the environmental damage and ongoing harm to public health and air quality (including the injuries to Sierra Club's members as set forth above) resulting from its violations;

127.    Assess civil penalties against JLM pursuant to 42 U.S.C. § 7413 and 40 C.F.R. § 19.4;

128.    Order that, pursuant to 42 U.S.C. § 7604(g)(2), $100,000.00 of the civil penalties assessed against JLM be used in beneficial mitigation projects to enhance public health and the environment (including enhanced air quality monitoring) in the areas where Sierra Club members live, work and recreate and that are adversely impacted by JLM's illegal emissions;

129.    Retain jurisdiction of this action to ensure compliance with the Court's Order;

130.    Award Sierra Club their costs of litigation, including reasonable

attorney fees, pursuant to 42 U.S.C. § 7604(d); and

131.    Grant such other relief as the Court deems just and proper.

Dated this 3rd day of December, 2019

Respectfully submitted,

*Reed Zars*

Reed Zars (WY State Bar No. 6-3224)
Attorney at Law
910 E. Kearney Street
Laramie, WY   82070
Telephone: (307) 760-6268
reed@zarslaw.com

Gabriel Clark-Leach (TX State Bar No. 24069516)
Environmental Integrity Project
1206 San Antonio Street
Austin, Texas 78701
Telephone: (512) 637-9479
Email: gclarkleach@environmentalintegrity.org
*Application for admission granted; swearing in
scheduled December 2019*

George E. Hays (WA State Bar No. 53874)
P.O. Box 843
Bellevue, WA 98009
Telephone: (415) 566-5414
Email: georgehays@mindspring.com
*Application pending for admission*

*Counsel for Sierra Club*